844 So.2d 832 (2003)
STATE of Louisiana
v.
Kenyon R. WILLIAMS.
No. 2002-K-1406.
Supreme Court of Louisiana.
April 9, 2003.
Rehearing Denied May 30, 2003.
Christopher A. Aberle, Mandeville, for Applicant.
Richard P. Ieyoub, Attorney General, Darryl W. Bubrig, Sr., District Attorney, Gilbert V. Andry, IV, New Orleans, for Respondent.
PER CURIAM.
In this prosecution for multiple felony charges arising out of the invasion of adjoining house trailers belonging to Delwin Ancar and his sister, Rolenda Merrick, by three men looking for drugs and money on a fall night in Plaquemines Parish, the trial court prohibited counsel from cross-examining Ancar about the terms of a plea bargain he had struck with the state in an apparently unrelated cocaine prosecution because "the suggestion that this witness... might be gaining something by testifying... is purely and entirely speculative and the jury can gauge whether the prospect of leniency tainted his testimony." We granted relator's application to reverse that ruling. Even assuming that the trial judge correctly assessed the scope of the plea bargain, exclusion of evidence regarding the disposition of Ancar's cocaine charges nevertheless impaired relator's right to confront and cross-examine the principal witness against him at trial and thereby deprived jurors of relevant information they needed to assess reliably the credibility of Ancar's testimony.
The charges in this case stemmed from an incident on the evening of November 4, 1999, when three men appeared at the doorway of Ancar's trailer in Home Place along Highway 23 in Plaquemines Parish. In the confrontation that followed, the men pulled Ancar out of the trailer, demanded that he tell them where he had the money and drugs, invaded the trailer also occupied *833 by Ancar's girlfriend, Yvonne Barthelemy, and his niece, Latisha Ancar, and took over $6,000 in cash, an amount which Ancar claimed combined a loan from his mother and money provided by the attorney he had hired in a civil case.
The confrontation then spilled over to the adjoining trailer occupied by Ancar's sister, Rolenda Merrick, and her teenage son, Kendal Merrick, and ended in the shooting of Ancar as the men fled in a late-model Cadillac. Testimony from the witnesses at the scene identified relator's co-defendants, Coleman and Jackson, as two of the men involved in the incident. However, the third man had worn a ski mask which completely covered his face, and of all of the witnesses on the scene, only Ancar could identify him. Ancar had managed to break free from the grasp of Jackson outside of his sister's trailer and he escaped to the neutral ground splitting the highway. He looked back and saw the three men running across Highway 23 for the Cadillac. At that moment, Ancar told jurors, the third perpetrator pulled his ski mask off and Ancar recognized relator, whom he had met on prior occasions. Moments later, as Ancar began running back towards the trailers, a shot rang out from the Cadillac striking him in the chest. Ancar made his way back to his trailer where he collapsed on the floor in front of Barthelemy. Rolenda Merrick then placed her brother in her truck and drove him to the Port Sulfur Comprehensive Care Center for treatment of the gunshot wound. Along the way, Ancar described the Cadillac used as the getaway vehicle. He also mentioned that he knew one of the perpetrators but did not identify him by name. Ancar also neglected to provide that information to the police when they initially interviewed him at Charity Hospital in New Orleans, where he had been transported after emergency treatment at Comprehensive Care. However, in a photographic lineup conducted at the hospital on the following afternoon, Ancar identified all three men, including relator, although neither he, nor any other witness at the scene, could identify the perpetrator who actually fired from the fleeing Cadillac.
Acting on the description of the getaway vehicle provided by Ancar, the police stopped the Cadillac in Belle Chase, approximately an hour after the incident and some 20 to 30 miles away from the trailers in Home Place. Relator sat at the wheel; Jackson and Coleman rode as his passengers, although the vehicle was registered in Jackson's name. The police did not find any firearms in the car or a ski mask, or $6,000 in cash. After Yvonne Barthelemy arrived at the scene of the arrest and identified Coleman and Jackson, the three men were taken to jail.
Relator was charged with one count of attempted first degree murder, one count of armed robbery, two counts of aggravated burglary, and two counts of false imprisonment while armed with a dangerous weapon, in violation of La.R.S. 14:27; 14:30; La.R.S. 14:64; La.R.S. 14:60; and La.R.S. 14:46.1, respectively. The state dismissed the armed robbery charge, and after a three-day jury trial in a consolidated proceeding also involving Jackson and Coleman, relator was found guilty of aggravated battery and two counts of unauthorized entry of an inhabited dwelling. The jury acquitted him on the two counts of false imprisonment. The co-defendants were also found guilty in differing combinations of verdicts returned by the jury. The trial court sentenced relator to a total of 13 years imprisonment at hard labor. On appeal, the Fourth Circuit affirmed the convictions and sentences after rejecting relator's single assignment of error challenging the restrictions placed by the trial court on counsel's cross-examination of Ancar. *834 State v. Williams, 01-1464 (La.App. 4th Cir.5/1/01), 818 So.2d 274.
The restrictions at issue arose in the following context. In his direct testimony, Ancar conceded that in July, 2000, only three months before trial in the present case, he had entered a guilty plea to possession of cocaine and received a suspended sentence and probation. On cross-examination, relator's counsel asked Ancar whether he had been charged initially in that prosecution with two counts of distribution of cocaine. Counsel thereby sought to establish that as a result of a plea bargain the state had dismissed one count of distribution and reduced the other count to simple possession of cocaine. Ancar had then pleaded guilty under the auspices of La.C.Cr.P. art. 893(D)(2), which will permit him to move for expungement of the conviction if he successfully completes the probationary term imposed by the court.
The state immediately objected to any questions about the nature of Ancar's plea bargain in the narcotics case and asked the court to excuse the jury. In the argument that followed, the court initially overruled the objection on grounds that the defense "can ask [the witness] whether or not there were any such deals to enter into this and attack his credibility." However, the court then entertained testimony from Ancar, who insisted he pled guilty only because he feared the mandatory five-year minimum sentence if convicted of distribution of cocaine, and from Patrick Hufft, the assistant district attorney responsible for prosecuting the case. Hufft maintained that problems with identifying Ancar as the driver of the car used in separate distributions to undercover officers at the end of September and the beginning of October, 1999, as well as Ancar's first offender status, led to the favorable plea bargain. Both Ancar and Hufft steadfastly denied that the plea in the cocaine case had any connection with the proceedings in the present case, and Hufft maintained that the decision to sentence Ancar under La.C.Cr.P. art. 893(D)(2) was the court's alone, at the request of defense counsel during the plea colloquy, without any input from him. Hufft also explained that after the present case was allotted to the same section of court as the cocaine case, he immediately transferred it to another section and scrupulously avoided any contact with the prosecutors in charge of the case.
On the basis of testimony by Ancar and Hufft, the trial court reversed itself and sustained the state's objection. The court thereby precluded defense counsel from establishing from the witness anything more than his conviction for possession of cocaine. Upon returning the jurors to the courtroom, the trial judge informed them that he had sustained the state's objection and admonished them not to draw "any conclusions or speculate about anything" with regard to defense counsel's question about the arrest for cocaine distribution.
After reviewing the record of the proceedings conducted outside of the jury's presence, the Fourth Circuit agreed on appeal with the trial court that "there was no memorandum of understanding between the State and Ancar concerning his testimony in the present case," and that the terms of the plea bargain therefore "bore no relation to the instant case." State v. Williams, 01-1464 at 6, 818 So.2d at 278. The dissent argued that "there could have been an oral commitment to testify in exchange for a reduced sentence... the jury should have been aware of this possible motivation so that it could attach the appropriate amount of weight to it in deciding on a verdict." Williams, 01-1464 at 1, 818 So.2d at 279 (Plotkin, J., dissenting).
*835 Although the trial court was sensitive to a defendant's Sixth Amendment right of confrontation and cross-examination, the court ultimately made the wrong decision when it restricted counsel's questioning of Ancar and thereby impaired relator's ability "to expose to the jury the facts from which [it] ... could appropriately draw inferences relating to the reliability of the witness." Olden v. Kentucky, 488 U.S. 227, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988)(internal quotation marks and citations omitted). To the extent that exposure of a witness's motivation "is a proper and important function of the constitutionally protected right of cross-examination," State v. Nash, 475 So.2d 752, 755 (La.1985), this Court has held on numerous occasions that a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." State v. Brady, 381 So.2d 819, 822 (collecting cases); see also State v. Bowie, 00-3344, p. 9 (La.4/3/02), 813 So.2d 377, 385 ("A defendant's right to demonstrate facts and circumstances which might influence the witness's perceptions or color his testimony, thereby lessening the weight the fact-finder might accord his testimony, is guaranteed in both state and federal criminal proceedings and is an important function of the right to confront and cross-examine.") (citations omitted). A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct. Brady, 381 So.2d at 822; see also Nash, 475 So.2d at 755-56. Moreover, even after pending charges have been resolved, bias may arise from a witness's "vulnerable status as a probationer." Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974).
We need not decide whether, as relator argues, the trial court usurped the jury's role as the fact-finder by denying jurors the opportunity to infer from the timing and nature of the plea bargain a connection between the narcotics prosecution and the present case. Even assuming that Ancar had no motive to protect a guilty plea premised on a specific condition (express or implied) that he would testify against relator and his co-defendants, the witness may have subjectively believed that continued cooperation with the state was necessary to protect his probationary status and to forestall any chance of going to jail. It was the fear of incarceration, Ancar made clear in his testimony outside the jury's presence, that led him to accept the plea bargain although he continued to profess his innocence. At the time he entered his guilty plea, Ancar had been subpoenaed for a pre-trial hearing conducted in the present case only one week later. As relator's counsel characterized Ancar's situation, "So one week you were being prosecuted and the next week you're the witness...." Jurors knew from Ancar's direct testimony that he had pleaded guilty to possession of cocaine and had received probation. However, without the full context of the proceedings set out before them, including the terms of the plea bargain, jurors lacked any basis for assessing how intertwined the two cases may have been in Ancar's mind, how closely associated the plea bargain in one case was to his appearance as a victim/witness in the other, and how much pressure Ancar may have felt to cooperate in the prosecution of relator and his co-defendants, not only to protect his probationary status but also to distance himself from the darker implications arising out of the loss of thousands of dollars in cash from his trailer and testimony of family members that the perpetrators were looking for money and drugs only a month after he had been *836 implicated in the cocaine sales to undercover agents.
The trial court therefore erred in precluding defense counsel from delving into the details of Ancar's prior cocaine conviction to expose for the jury's consideration the sources of possible bias or partiality of the witness. While confrontation errors are subject to harmless-error analysis, Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), we cannot say in the present case that the jury's verdict was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Ancar was not the only witness at trial who purported to identify relator as one of the three perpetrators. In her direct testimony, Rolenda Merrick identified relator as the masked man who had entered her trailer. However, under cross-examination, Merrick conceded that she made that identification only "because they all was together when they got arrested," information she had first obtained from Yvonne Barthelemy at the Detective Bureau of the Plaquemines Parish Sheriff's Office in the early morning hours following the incident. Merrick had therefore assumed, by process of elimination, that relator had been the man wearing the mask.
Ancar's testimony was susceptible to the same challenge. In addition to conceding that he had not informed anyone of relator's name before he viewed the photographic lineups shown to him in Charity Hospital on the day after the incident, including his sister to whom he had described the getaway vehicle during the trip to Comprehensive Care in Port Sulfur, Ancar also acknowledged that Rolenda Merrick informed him in the hospital before the lineups that relator had been arrested along with Coleman and Jackson. Ancar further conceded under cross-examination that he had not mentioned to anyone before the lineups that the third perpetrator had removed his ski mask just before entering the getaway car:
Q. Do you remember giving the statement to the detective at the hospital the next day?
A. Yes.
Q. Did you tell him about anybody pulling a mask off?
A. No.
Q. So when did you first start saying to people that you saw him take off a mask?
A. Like three days, four days later.
Q. But you didn't tell the detective that when he took a statement from you the next day and you didn't tell your sister that even though it might have helped to apprehend the people that shot you, is that right?
A. No.
The state offered no evidence at trial that Ancar had, in fact, conveyed to anyone connected with the investigation this critical piece of information before the witness's appearance at the pre-trial hearing conducted in the present case one week after he entered his guilty plea in the narcotics case. Ancar's failure to name relator to anyone before the photographic array had already eroded the credibility of his identification. Jurors may have viewed his testimony in an entirely different light if they had been afforded the opportunity to consider, in the context of the temporal and physical distance separating the incident from the arrests of the three men, the extent to which Ancar's vulnerable status as a probationer may have colored his testimony to shore up his identification of relator.
The decision of the court of appeal is therefore reversed, relator's conviction and sentence are vacated, and this case is remanded *837 to the district court for further proceedings consistent with the views expressed herein.
COURT OF APPEAL DECISION REVERSED; CONVICTION AND SENTENCE VACATED; CASE REMANDED.
TRAYLOR and KNOLL, JJ., dissent and assign reasons.
TRAYLOR, J., dissenting.
I dissent from the majority's overruling of the trial court and court of appeal. As the court of appeal ably pointed out, the record in this case establishes that Ancar did not enter into a plea agreement with the state to testify against the defendant in exchange for leniency on his own pending charge. Furthermore, testimony from Ancar and the assistant district attorney on Ancar's case regarding Ancar's plea was proffered and is preserved in the record. As no memorandum of understanding was confected between Ancar and the state and considering the above proffered testimony, I agree with the court of appeal's determination that Ancar's plea agreement bore no relation to the instant case. Therefore, I would find no prejudice to the defendant due to the trial court's denial of a cross examination of Ancar before the jury.
KNOLL, Justice, dissenting.
I dissent from the majority's reversal of defendant's conviction. It is clear the jury knew from Ancar's direct testimony that he pleaded guilty to possession of cocaine in an unrelated case and he received a suspended sentence and probation. In addition, Ancar conceded in his testimony that his guilty plea to possession of cocaine and his sentencing occurred only three months prior to defendant's trial in the present case. Accordingly, I find the jury was provided with information of Ancar's criminal conviction, the sentence imposed, and the close temporal proximity of that disposition to Ancar's testimony against the defendant in this trial. Viewing this evidence as a whole, I do not find any abridgment of defendant's right to demonstrate facts and circumstances which might have affected Ancar's testimony. Furthermore, at the time of Williams's trial, Ancar had no motive to protect his guilty plea. The majority's interjection of Ancar's subjective belief that his continued protection of his probationary status creates a dangerous precedence, one that is not supported by the jurisprudence. Therefore, I would affirm the defendant's conviction and sentence.