Judge Madeleine M. Landrieu
_JjOn December 9, 2015, a jury returned a verdict finding Kenneth Halley and John Chambers each guilty of the April 5, 2005 second degree murder of Joseph Lucien. Although jointly tried, each defendant has filed a separate appeal.[1] After the disposition of post-trial motions filed by Mr. Halley and after the expiration of all legal delays, Mr. Halley was sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence. It is from this conviction and sentence that Mr. Halley now appeals.
ASSIGNMENT OF ERROR
In his sole assignment of error, Mr. Halley claims his right to cross-examination under the Confrontation Clause of the Sixth Amendment was violated when the trial court allowed into evidence a statement made by Mr. Halley’s co-defendant, Mr, Chambers, which implicated Mr. Halley in this shooting, Mr. Chambers did not testify at trial. The statement was admitted through the testimony of another witness, A.M.[2] For the reasons that follow, we find this assignment of error to be without merit,
^STATEMENT OF THE CASE
On the morning of April 5, 2005, Detective Ernest Rome of the New Orleans Police Department responded to a report of a homicide on the 2300 block of Alabo Street. When he arrived on the scene, Det. Rome observed the victim, with apparent gunshot wounds, lying in an alley next to a house. EMS arrived a short time later, and medical personnel pronounced the victim dead at the scene. The victim was later identified as Joseph Lucien.
Detective Rome and other responding officers cordoned off the crime scene and canvassed the area for witnesses and evidence useful to the investigation. No witnesses were forthcoming. Later that day, two witnesses—R.R. and E.M.—arrived at *599 the police station and met with Det. Rome. As a result of the statements given by R.R. and E.M. and an identification made by them, Det. Rome obtained arrest warrants for both Kenneth Halley and John Chambers.[3] The defendants were arrested the day after the shooting, but no charges were filed at that time because pertinent witnesses refused to testify.
According to the trial testimony of an Assistant District Attorney, his office reviewed the case again in 2013. After further investigation, the case was presented to a grand jury, which returned an indictment against both Mr. Halley and Mr. Chambers in August of 2013. The case proceeded to trial in December of 2015.
DISCUSSION
Before addressing the assignment of error raised by Mr. Halley, we first note an error patent on the face of the record.
IsThe prosecution of an offense punishable by death or life imprisonment, such as second degree murder, shall be instituted by grand jury indictment. La.C.Cr.P. art. 382(A); La. R.S. 14:30.1(8). The indictment must have been endorsed “a true bill,” signed by the Grand Jury Foreman and returned into the district court in open court. La. C.Cr.P. art. 383. The record in this appeal contains the front, but not the back, of the bill of indictment where the proper endorsement and signature would appear. However, the trial court minutes and the list of the Grand Jury Return of Indictments contained in the record indicate the indictment was indeed returned as a “true bill” in open court and properly signed by the foreperson of the grand jury. Thus, we find this patent error to be harmless.
Turning now to Mr. Halley’s sole assignment of error, we first note that a defendant cannot avail himself of. an alleged error without having made a contemporaneous objection stating the specific ground of the objection, and he is limited on appeal to that.ground articulated at trial. La. C.Cr.P. art. 841(A); State v. Martello, 98-2066, p. 5 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1197, citing State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346, quoting State v. Chisolm, 95-2028, p. 6 (La.App. 4 Cir. 3/12/97), 691 So.2d 251, 255., “One purpose of the contemporaneous objection rule is to require counsel to call an error to the judge’s attention at a time when the judge can correct the error.” State v. Arvie, 505 So.2d 44, 47 (La. 1987).
Mr. Halley did not file any motions objecting to the admissibility of Mr. Chambers’ statement, nor did he lodge an objection at the time the testimony was elicited.[4] Accordingly, he cannot now complain. Nevertheless, even had the issue |4been reserved for appellate review, Mr. Halley’s assignment of error would be without merit because wé find the statement at issue to be “non-testimonial” and harmless.
The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” This right is secured for defendants in state as well as federal criminal proceedings. See Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 928 (1965). The confrontation clause of the Louisiana constitution specifically and expressly guarantees each accused the right “to confront and cross- *600 examine the witnesses against him.” La. Const, art. 1, § 16.
“The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.” Davis v. Alaska, 415 U.S. 308, 316-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. WIGMORE, EVIDENCE § 1395, p. 123 (3d ed.1940)). Cross-examination is the principal means by which believability and truthfulness of testimony are tested. Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness. See Davis v. Alaska, 415 U.S. at 316, 94 S.Ct. at 1110; State ex rel. Nicholas v. State, 520 So.2d 377, 380 (La. 1988); State v. Hillard, 398 So.2d 1057, 1059-1060 (La. 1981).
The United States Supreme Court decision in Crawford v. Washington, 541 U.S. 36, 50, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), is the starting point for any analysis regarding the admissibility of hearsay testimony in light of the protections afforded defendants by the Sixth Amendment of our Constitution.
|f“[T]he principal evil at which the Confrontation Clause is directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused [at trial].” Id., p. 50, 124 S.Ct. at 1363. As a result, “[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.” Id., p. 68, 124 S.Ct. at 1374.
In State v. Norah, 2012-1194 (La.App. 4 Cir. 12/11/13), 131 So.3d 172, writ denied, 2014-0084 (La. 6/13/14), 140 So.3d 1188, and writ denied, 2014-0082 (La. 6/20/14), 141 So.3d 287, this court held that inculpa-tory statements made by a jointly-tried, non-testifying co-defendant during a jailhouse telephone call to a friend during booking were non-testimonial and did not trigger the Confrontation Clause. In reaching that conclusion, this court reasoned:
The contours of the Confrontation Clause’s relevance in the inclusion or exclusion of certain hearsay statements at trial are defined by the term “witness” in its text. Id. at 51, 124 S.Ct. 1354. A “witness” is one who “bears testimony.” Id. “Testimony” is “a solemn declaration or affirmation made for the purpose of establishing or proving some fact.” Id. (internal punctuation omitted). Thus, a statement must be “testimonial” in nature for the procedural protections set forth in Crawford to apply. Whether a statement is “testimonial” has proven to be jurisprudentially enigmatic. The U.S. Supreme Court has abstained from too rigidly defining the parameters of this term, utilizing instead a fluid, situational approach.
Id., p. 18,131 So.3d at 186.
In Michigan v. Bryant, the Court provided a framework to assist lower courts in determining whether a statement qualifies as testimonial. See 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). The Court emphasized that “the relevant inquiry is ... the purpose that reasonable participants would have had, as ^ascertained from the individuals’ statements and actions and the circumstances in which the encounter occurred.” Id., p. 360, 131 S.Ct. at 1156.
To give context to the statement complained of, we offer a further review of the facts presented to the jury.
R.R., one of the witnesses who gave a statement to Det. Rome on the day of the *601 shooting, testified at trial. He testified that he lived in the Lower Ninth Ward on Alabo Street most of his life, and he and the victim were neighborhood friends. R.R. also knew Kenneth Halley and had met John Chambers through Halley. Recounting the day Mr. Lucien was killed, R.R. testified that his girlfriend dropped him off at his grandmother’s house on Alabo Street. R.R. could not remember any particulars of the shooting or its aftermath. He said he was testifying at the trial involuntarily and only because he had been subpoenaed and arrested. He acknowledged that he had gone to the police station after the shooting but did not remember telling the police he had been in the 2300 block of Alabo Street at the time of the shooting.
The State played and introduced into evidence a recording of a statement given by R.R. to Detective Rome on the day of the shooting. In that statement, R.R. said he and others were sitting together on a porch in the 2300 block Alabo Street on April 5, 2005 when the victim walked up and told them he had beaten up a man named Lloyd at Wagner’s Market. About ten minutes later, Kenneth Halley, John Chambers, and two other men, M.M. and Lloyd, drove up in a blue Ford Explorer. R.R. said the two-door Explorer was “owned by L.C.’s mother.” (L.C. was a neighborhood friend known to most of the witnesses who testified. An investigator testified that he was able to corroborate that A.C. owned the Explorer.)
|7The defendants and their two passengers drove past the house on Alabo Street, circled back and returned to the house. R.R. watched as Kenneth Halley, who was sitting in the front passenger seat, jumped from the vehicle armed with an AK-47 and shot the victim once. R.R. yelled at the occupants of the Explorer to leave the neighborhood. As Mr. Halley got back into the Explorer, John Chambers, who was driving the Explorer, exited the vehicle and also shot the victim with an AK-47. R.R. called 911 and attempted to aid the victim; however, the victim died on the scene. When the police arrived, R.R. directed them to the victim’s body and related the facts of the shooting to the officers. R.R. said the victim would probably have lived if he had not been shot a second time. R.R. identified a picture of Kenneth Halley as one of the shooters, pointing out Mr. Halley’s eight gold teeth.
R.R.’s statement to police described John Chambers as a tall, thin, red male with a gold plate in his mouth. R.R. said Mr. Chambers lived in a black and white house on Deslonde Street. Finally, R.R. said he feared for his life if the police did not arrest John Chambers, Kenneth Halley, M.M. and Lloyd.
E.M. testified that he had lived in the Ninth Ward his entire life and knew both Kenneth Halley and John Chambers. At the time of the shooting, E.M. lived on Reyes Street and considered the victim a neighborhood friend. E.M. recounted that on April 5, 2005, at about 10:00 a.m., he, the victim and R.R. were seated on a porch in the 2300 block of Alabo Street. About forty-five minutes later, a two-door, blue Explorer stopped in the street in front of where they were seated. Kenneth Halley stepped out of the car and shot the victim once with a rifle. Everyone ran. Mr. Halley got back in the Explorer, which then moved forward a bit and stopped. As E.M. was walking back to the scene, he heard a second shot Rand observed Mr. Chambers running back to the Explorer. Mr. Chambers had shot the victim with the same rifle Mr. Halley had used. Immediately afterwards, E.M.’s father drove him to the Fifth District Police Station to give a statement. E.M. identified Mr. Halley and *602 Mr. Chambers as the men who had shot and killed the victim.
A.M. was then called to testify. He testified that he, the defendants (both Mr. Chambers and Mr. Halley) and the victim were childhood friends from the Ninth Ward. One day, in 2005, he was on the medical tier of Orleans Parish Prison at the same time as Mr. Chambers. At that time, Mr. Chambers told A.M. he was in prison for the shooting death of Joseph Luden, Mr. Chambers told A.M. that the victim had gotten into a fight with “Lloyd,” one of the defendants’ friends. Shortly after the fight, both Mr. Halley and Mr. Chambers drove through the neighborhood looking for the victim. When the defendants spotted the victim sitting on a porch on Deslonde Street, they jumped from the car, a Ford Explorer, and took turns shooting at the victim with an AK~ 47. Mr. Chambers told A.M. that the victim had started the fight. A.M. further testified that in 2011, he had sent a letter to NOPD revealing to them what Mr. Chambers had told him back in 2005. His letter was introduced into evidence.
A.M. denied having seen any news reports about the shooting, saying the only information he had received had come directly from Mr. Chambers. Although A.M. had also seen Mr. Halley in prison at the time he spoke with Mr. Chambers, A.M. said Mr. Halley did not mention the shooting. A.M. identified both defendants at trial.
Pursuant to further questioning, A.M. identified M.M. as his foster brother, who also grew up with the defendants. A.M. testified that he also knew L.C.
|3On cross-examination, A.M. testified he was neither promised nor did he expect to receive any consideration from the federal government or the state for his testimony in this case, or any other case. Defense counsel questioned A.M. about the letter A.M. had written to the NOPD regarding this case in which A.M. had claimed “[he and his boys] would go all out, and f— the city up.” A.M. explained he had not actually written the letter but had another inmate write it because that inmate was more educated than he. Further, A.M. said those words were the inmate’s and not his own, and that the inmate was referring to his own knowledge of crimes that had occurred in the Magnolia Housing Development. A.M. claimed the inmate told him if he had anything to put in the letter about other crimes, he better do so because if A.M. withheld information, the federal government would charge him with conspiracy.
In support of A.M.’s testimony, the state called Blake Arcurie, General Counsel Risk Manager with the Orleans Parish Sheriffs Office, who testified he kept all inmate records for the Sheriffs Office. He had reviewed the lock up records of Mr. Halley, Mr. Chambers and A.M. for April and May of 2005. According to the inmate location inquiry Arcurie had run on those individuals, all three had been housed in Orleans Parish Prison during the same period.
First Assistant District Attorney Gray-mond Martin testified he reviewed the 2005 homicide of Joseph Lucien at the time it occurred. Martin noted that although Kenneth Halley and John Chambers were arrested for the homicide, the case was refused for prosecution at that time because the witnesses refused to testify. He added that in 2013, the case was reviewed once again, witnesses were located, evidence was re-examined, and ultimately, the case was presented to the ImGrand Jury, which returned an indictment. After the grand jury returned the indictment, the District Attorney’s office received the letter from A.M.
*603 A.M.’s chance encounter with a Mend in prison that led to a casual conversation about what each was doing in prison, cannot, by any objective standard, be considered testimonial. His statement was not made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. See Crawford, supra, 541 U.S. at 51-52, 124 S.Ct. at 1364. Thus, the assignment of error is without merit.
We further note that confrontation eiTors are subject to a Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), harmless error analysis. See Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Williams, 2002-1406 (La. 4/9/03), 844 So.2d 832; State v. Henderson, 2013-0526 (La.App. 4 Cir. 2/19/14), 136 So.3d 223.
The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.
Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438.
The jurisprudence provides that a verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). There is more than sufficient evidence in this record, ^disregarding the statement of Mr. Chambers, to establish Mr. Halley’s guilt beyond a reasonable doubt. Two witnesses who knew both defendants and the victim were eyewitnesses to the shooting. Mr. Chambers’ statement, offered through the testimony of A.M., was merely cumulative. Thus, if Mr. Halley had preserved this issue for our review, and even if the statement were testimonial, we would find the error harmless.
CONCLUSION
For the reasons stated above, we affirm the defendant’s conviction and sentence.
AFFIRMED

. Mr. Chambers' appeal bears docket number 2016-KA-0712 in this court.

. In an effort to protect the privacy of the witnesses in this case, who testified under fear of retaliation, they are referred to by their initials rather than their full names.

. Warrants were also obtained to search their residences, but nothing related to the-crime was found at either residence.

. The State properly and timely filed a Notice of Intent to introduce an inculpatory statement made by the defendant(s). See, La. C.Cr.P. art 768,